**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

MARIA HARRIS, et al.,          )
                               )
            Plaintiffs,        )
                               )          No. CIV 08-008-TUC-CKJ
vs.                            )
                               )          **ORDER**
COCHISE COUNTY,                )
                               )
            Defendant.         )
                               )
_____)

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment [Doc. # 132] and Defendant's Motion for Summary Judgment [Doc. # 129].  Also pending before the Court is Plaintiff's Motion to Strike Affidavit [Doc. # 147] and the parties' objections to opposing statements of facts.  Oral argument was presented to the Court on August 3, 2009.

*Factual and Procedural Background*

Plaintiff Maria Harris ("Harris") was hired by Defendant Cochise County ("Cochise County" or "the County"), Health Department, on or about October 4, 2004, as an HIV/AIDS Caseworker I.  Harris obtained this position through a competitive application process rather than an election or an appointment.  Generally, Harris's duties were to provide support, advocacy, and case management; she also did other things for clients such a financing paperwork, working with other agencies, assisting with client paperwork, and assisting with client funding.  Harris had significant client interaction.  Harris was not in a supervisory or managerial position; Brian Oertel ("Oertel") was the Program Coordinator and Harris's direct

1   supervisor.   As Program Coordinator, Oertel was responsible for managing HIV/AIDS

2   program staff, performing public relations functions regarding the program, developing long

3   term planning and goals, and was responsible for the financial management of the program.

4   Diane Carper ("Carper"), the Director of the Health Department, was the chief

5   managing officer within the Health Department and was responsible for developing and

6   implementing government policy through new programs, policies, and procedures; managing

7   the department and program budgets, and; managing all staff and personnel issues.   Julie

8   Morales ("Morales") was the Cochise County human resources manager.

9   In May 2005, Harris began to experience abdominal cramping, and nausea.   Harris

10   sought evaluation and treatment from her husband, Dr. Glenn Harris ("Dr. Harris").[1]   Dr.

11   Harris prescribed a two-week course of antibiotics.   When the symptoms returned in August

12   of 2005, Dr. Harris again treated Harris with a course of antibiotics and recommended that

13   Harris see a specialist; Dr. Harris referred Harris to Dr. Jaya Maddur ("Dr. Maddur").   After

14   varied testing and treatment, Dr. Maddur communicated his diagnosis of esophagitis and acid

15   reflux disease to Harris on October 18, 2005.   Dr. Maddur instructed Harris to continue with

16   anti-reflux measures and proton-pump inhibitors.

17   The County asserts that, in the ten months which precede Harris' resignation, she had

18   numerous conversation with Oertel concerning the stress and associated symptoms that

19   Harris was experiencing – on more than one occasion, Harris expressed to Oertel that Harris

20   was experiencing work stress and feelings of stomach problems, headaches, and a

21   corresponding desire to leave work because of the stress and symptoms.   The County further

22   asserts that there were occasions when Harris would return to the office, from traveling to

23   meet clients, and would relate to Oertel that a given client was creating problems for her and

24

25   _____

26   [1]Dr. Harris is a named plaintiff.   Additionally, Cochise County points out that Harris's deposition testimony does not state that she sought evaluation and treatment from her

27   husband.   Further, Dr. Harris testified to the contrary, that he did not formally treat Harris. Harris's deposition testimony indicates that Dr. Harris prescribed medication, not that she

28   sought evaluation and treatment from him.

then she would immediately discuss her stomach issues.  The County also asserts that Harris complained to the County Health Department's Administrative Coordinator, Maria Mena ("Mena"), that Harris had stomach problems, was going through a lot of stress, and may have mentioned that she believed she had ulcers.

On August 15, 2005, at 10:58 a.m., Harris wrote an email to Oertel asking to take six hours of sick time, stating "I did my job this morning, but I am having a 'day of burning hell' (stomach).  County Statement of Facts ("DSOF"), Ex. B.  On that same day, at 12:57 p.m., Harris wrote an email to Oertel stating "I feel exhausted of too much traveling, (with our clients, there is no other way, lack of resources = to personal attention and support)."  DSOF, Ex. C.

On August 24, 2005, Harris presented a leave slip to Oertel for sick time for October 4, 5, and 18, 2005.

On August 26, 2005, at 8:39 a.m., Harris wrote an email to Oertel stating she "got out of the hospital this morning – it was not critical – I got scared because I vomited noticed some blood."  DSOF, Ex. E.

On September 1, 2005, at 8:23 a.m., Harris wrote an email to Oertel indicating she had a terrible night and morning with vomiting, stomach pain and fever and indicated that the doctor "told me it is in my best interest (health) to stay away from work until I have the medical procedure (October the 4th)[.]"  DSOF, Facts, Ex. F.  The email also stated that Harris would be furnishing Oertel with all the paperwork and doctor's note "as soon as I meet with him."  *Id*.  The email further stated "I did my best in working even when feeling ill, but all I am doing is harming my health."  *Id*.

On September 1, 2005, Harris presented a leave slip to Oertel for sick days on September 1 and 2, 2005.  On September 2, 2005, Oertel wrote an email to Harris stating that he had taken steps to alleviate some of the stress and that she would return to a much healthier environment.  The email discusses program members treating staff with dignity and respect, and allowing Harris to work out of Sierra Vista on Thursdays.

Harris never wrote out a leave slip for the rest of September of 2005.  During her deposition, Harris testified that she did not have specific written permission to be absent from work from September 2, 2005, to October 4, 2005, and that she did not have specific verbal permission from Oertel to be absent during that period.  Harris asserts in her Statement of Facts that she applied for and was granted medical leave for her medical condition and that Oertel signed her medical leave forms which included a note from her primary care physician, Dr. James Buttke, that Harris's condition prevented her from working.[2]

On September 30, 2005, Oertel emailed and mailed a letter to the HIV/AIDS program members; Harris asserts that approximately 50 program members received the letter, while Cochise County asserts that the evidence does not establish this.  Oertel also emailed the letter to additional individuals who were not program members.  The letter stated, *inter alia*:

> I want to take this time to thank everyone for their patience and cooperation during the past few weeks while Maria Harris was out on medical leave.  She has been out due to a stress related illness and will be returning in the next week or so.  This is often a very stressful job and as the program coordinator, I appreciate all that you do as clients to cooperate with us to facilitate the delivery of services to you. . . . It is the very small percentage of clients that I must address with this letter.
>
> This small but very vocal group has in the past have been abusive to staff members for a very long time.  The abuses have been in both verbal and written forms, often accompanied by threats of legal action and/or reporting to the state and federal authorities.  These abuses have been very well documented over the years.  For those of you that have been with the program for some time know that this has had a negative impact on the case management staff.  Last year alone, two case managers resigned because of this abuse and now one is out on medical leave.  This abuse has directly impacted the level of service that the rest of you have had to experience.  As the program coordinator, I will no longer allow this type of behavior by such a small group, to compromise the quality of service that this program provides to provide services for the vast majority of those who work with in the programmatic guidelines of Ryan White Title II funding. . . .
>
> It is not the goal of this program to deny services to anyone, but I will do so to ensure the over-all quality of service to those whose do cooperate with staff and the over health of this staff will never be compromised again. . . . I have the support of the director of nursing who oversees this program and the director of the health department.  We have spoken to the county attorney's office and the administrator's office, and they concur that we do not, as employees of the Cochise County Health Department, have to endure this type of abuse by clients.  For this small group of

---

[2]The exhibit does not include the statement that Harris's condition prevented her from working.  *See* PSOF 20 and Ex. 8.

1    people who continuously provide this staff with this abuse, once again, these are
2    funded services, not entitlements. . . .

     I apologize to the vast majority of you who continue to make our work rewarding for
3    have to endure this letter and the diminished level of service that these individual
     continue to inflict on the rest of you. . . .
4
     * * * * *
5
     Thank you all and lets all hope that Maria returns to work soon and the level of
6    service that can be provided to our clients can be restored.

7    Harris's Statement of Facts ("PSOF"), Ex. 9.   Harris complained to Oertel, Carper, and

8    Morales about the letter and the disclosure of her private medical information.   The County

9    refused to issue a retraction of Oertel's September 30, 2005 letter.

10   On October 4, 2005, Carper sent Harris correspondence which stated, *inter alia*:

11   . . . I am concerned because I did not see you yesterday and I thought you were
     coming back then. . . .
12
     I certainly don't want to stress you out anymore when you are ill, but I want to be sure
13   you understand that I need to hear from you about your return to work.  I also will
     need a letter from your doctor stating your ability to return to work and the date you
14   will be returning.  As of now, you are on leave without pay.  Continued leave without
     pay requires the Board of Supervisors approval (County Manager "Administrator'
15   Approval if it is ninety days or less) so the situation is now out of Brian Oertel, mine
     or Hrs hands.  However, I understand that as of this date (October 4th) you qualify for
16   FMLA.  Applying for FMLA is a written process and cannot be accomplished by
     phone conversations.
17
     * * * * *
18
     . . . I will need to hear from you personally as to what your plans are by 5:00 p.m.
19   Friday, October 7th or, according to County policy, your absence will be considered
     job abandonment.  As this point, since you have been gone so long, things become
20   very official and involve much more than a conversation.  If you prefer, you may
     contact Julie Morales within the same timeframe 5:00 pm Friday, October 7th to
21   officially request FMLA.  Julie will instruct you on what needs to be done next.

22   * * * * *

23   Once again, please contact me by Friday, October 7th, by 5:00 pm and let me know
     how you are feeling and what your return date will be. . . .
24
     PSOF, Ex. 20.  On October 5, 2005, Harris responded to Carper by e-mail:
25
     My husband, Dr. Glenn Harris, and I have been shocked and appalled by the letter
26   sent to all of the HIV/AIDS clients of CCHD and ADHS and CFSA delineating my
     alleged stress related illness.  I have no such illness or condition, and even if I did,
27   broadcasting this to all of these people is a clear and flagrant violation of my privacy.
     Moreover, this action may seriously compromise my ability to function as an effective
28   case manager for the program.

> . . . . Please tell me your opinions and recommendations in these regards.  I am scheduled to return to work tomorrow if I receive clearance from my physician.  Without some resolution of this issue, I could be the "goat" of perhaps many our clients, and at least somewhat unable to effectively do my job.

PSOF, Ex. 17.  Harris asserts in her Statement of Facts that she felt compelled to resign and provided notice to Oertel, Carper and Morales.  Harris's e-mail stated:

> Please accept my immediate resignation as the case Manager for the HIV/AIDS program.  It was a pleasure to work with all of you in the Health Department.  At this point I am not able to disclose the specific reasons why the immediate resignation.  Please understand that is private, personal and critical information.  Meanwhile, I would like to thank all of you for the support and assistance during my year of employment with the Health Department.

> * * * * *

> P.S. Tomorrow October 7th, I would be delivering the Phone, office keys and couple of binders, and a formal/official and signed resignation letter.

> For what is worth, I have a copy of the leave slip with the approved 4th, 5th, and 18th of October.

PSOF, Ex. 23.

On October 11, 2005, Ken Wallace ("Wallace"), the Human Resources Director for Cochise County, contacted Harris and asked her to provide him an opportunity to address her concerns.  On November 16, 2005, Jody Klein ("Klein") contacted Harris with an offer of reemployment. PSOF, Ex. 19.  Harris asserts in her Statement of Facts that, because Cochise County refused to issue a retraction of Oertel's September 30, 2005, letter, she declined the offer.

On March 27, 2006, Harris served a notice of claim on the County.  The claim was served on the Clerk of the Cochise County Board of Supervisors on March 29, 2009.  Harris asserts in her Statement of Facts that the notice of claim was ten pages long, detailed the legal and factual basis for her claim, detailed the damages she had suffered, detailed the factual and legal basis for the damages and their calculation, and indicated that Harris would settle all claim against the County for $100,000.

On or about September 21, 2006, Harris filed a complaint in the Superior Court in and for the County of Cochise.  On January 2, 2008, the matter was removed to this Court.  Harris's Amended Complaint includes claims of defamation, invasion of privacy, false light

invasion of privacy, intentional infliction of emotional distress (two claims), wrongful termination in violation of public, negligent training and supervision, negligence (three claims), violation of the Americans With Disabilities Act, and violation of the Family and Medical Leave Act.

On December 15, 2008, Cochise County filed a Motion for Summary Judgment and Harris filed a Motion for Partial Summary Judgment. Responses and replies have been filed.

*Summary Judgment Legal Standard*

Summary judgment may be granted if the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. The moving party has the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "set forth specific facts showing that there is a genuine [material] issue for trial." *Id.*, 477 U.S. at 248, 106 S.Ct. at 2510, internal quotes omitted. The nonmoving party must demonstrate a dispute "over facts that might affect the outcome of the suit under the governing law" to preclude entry of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Further, the disputed facts must be material. *Celotex Corp.*, 477 U.S. at 322-23. In opposing summary judgment, a party is not entitled to rely on the allegations of his pleadings, Fed.R.Civ.P. 56(e), or upon conclusory allegations in affidavits. *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992). Further, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kiddle & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

1    The dispute over material facts must be genuine. *Anderson*, 477 U.S. at 248, 106

2    S.Ct. at 2510.  A dispute about a material fact is genuine if "the evidence is such that a

3    reasonable jury could return a verdict for the nonmoving party." *Id.*  A party opposing a

4    properly supported summary judgment motion must set forth specific facts demonstrating a

5    genuine issue for trial.  *Id.*  Mere allegation and speculation are not sufficient to create a

6    factual dispute for purposes of summary judgment. *Witherow v. Paff*, 52 F.3d 264, 266 (9th

7    Cir. 1995) (per curiam).  "If the evidence is merely colorable or is not significantly probative,

8    summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. at 2511.

9    However, the evidence of the nonmoving party is to be believed and all justifiable inferences

10   are to be drawn in his favor.  *Id.* at 255.  Further, in seeking to establish the existence of a

11   factual dispute, the non-moving party need not establish a material issue of fact conclusively

12   in his favor; it is sufficient that "the claimed factual dispute be shown to require a jury or

13   judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809

14   F.2d 626, 631 (9th Cir. 1987).

15

16   *Consideration of Admissible Evidence*

17   Additionally, the Court is only to consider admissible evidence.  *Moran v. Selig*, 447

18   F.3d 748, 759-60 (9th Cir. 2006) (pleading and opposition must be verified to constitute

19   opposing affidavits); *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991)

20   (declarations and other evidence that would not be admissible may be stricken).  A "genuine"

21   issue of "material" fact cannot be created by a party simply making assertions in its legal

22   memoranda. *Varig Airlines*, 690 F.2d at 1238.  Declarations and other evidence that would

23   not be admissible may be stricken. *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th

24   Cir. 1991).  Indeed, a "conclusory, self-serving affidavit, lacking detailed facts and any

25   supporting evidence, is insufficient to create a genuine issue of material fact." *Nilsson v. City*

26   *of Mesa*, 503 F.3d 947, 952 n. 2 (9th Cir. 2007), *citation omitted*.  Moreover, statements must

27   allege personal knowledge.  *See Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir.

28   1990) ("Like affidavits, deposition testimony that is not based on personal knowledge and

1  is hearsay is inadmissible and cannot raise a genuine issue of material fact sufficient to

2  withstand summary judgment."); *see also Block v. Los Angeles*, 253 F.3d 410, 419 n. 2 (9th

3  Cir. 2001); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975),

4  *quoting Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2nd Cir.

5  1969) ("[i]f a party who has been examined at length on deposition could raise an issue of

6  fact simply by submitting an affidavit contradicting his own prior testimony, this would

7  greatly diminish the utility of summary judgment as a procedure for screening out sham

8  issues of fact").   Additionally, the court is to review the record as a whole, but must

9  disregard evidence favorable to the moving party that the jury is not required to believe and

10  must give credence to the uncontradicted and unimpeached evidence of the moving party,

11  at least "'to the extent that that evidence comes from disinterested witnesses.'" *Reeves v.*

12  *Sanderson Plumbing*, 530 U.S. 133, 150-51, 120 S.Ct. 2097, 2110 (2000), *citation omitted*.

13       The Motion to Strike and the parties' objections place the statements in context and

14  clarify them.   The Court will deny the Motion to Strike and overrule the objections, but will

15  only consider the admissible evidence that is supported by specific facts that may show a

16  genuine issue of material fact.   *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

17

18  *Notice of Constructive Discharge*

19       In addition to the requirements of Arizona's notice of claim statute, Arizona law

20  imposes an administrative notice requirement prior to the maintenance of a constructive

21  discharge lawsuit:

22       B.  As a precondition to the right of an employee to bring a constructive discharge
         claim against an employer pursuant to subsection A, paragraph 1 of this section, the
23       employee shall take each of the following actions before deciding whether to resign:

24            1.     Notify an appropriate representative of the employer, in writing, that a
               working condition exists that the employee believes is objectively so difficult
25             or unpleasant that the employee feels compelled to resign or intends to resign.

26            2.     Allow the employer fifteen calendar days to respond in writing to the
               matters presented in the employee's written communication under paragraph
27             1 of this subsection.

28

3.      Read and consider the employer's response to the employee's written communication under paragraph 1 of this subsection.

A.R.S. § 23-1502(B).  Cochise County asserts that Harris failed to provide the required notice, despite Cochise County having maintained the requisite A.R.S. § 23-1502 posting. Therefore, Cochise County asserts that any state law claim for damages arising from an alleged constructive discharge must be dismissed.

Harris asserts, however, that a jury could find that Harris's October 5, 2005, email to Diane Carper coupled with her October 6, 2005, resignation met the statutory requirements.[3] Accepting for purposes of this Order that Harris's October 5, 2005, email adequately set forth the objectionable working condition, the Court nonetheless considers that Harris submitted her resignation the next day.  Harris did not attempt to provide the County with 15 days to respond to her complaint.[4]  Although the 15 day deadline had passed, Harris read and considered the November 16, 2005, letter.  *See* PSOF, Ex. 19.  However, where Harris's resignation letter was within one day of Harris's notice of the objectional conditions to the County, whether Harris considered the County's response is not relevant.

Additionally, Harris asserts in her Reply that the statute does not require that an employee "shall" remain at work during the 15-day period.  While the provision would seem to have no effect if that requirement was not implied, the Court does not find it necessary to determine the effect of this provision.  Harris clearly did not provide the County with 15 days to respond to the objectionable working conditions.  The Court finds Harris has failed to comply with the notice requirements of A.R.S. § 23-1502(B).

---

[3]In her Motion for Partial Summary Judgment, Harris asserts that there is undisputed evidence that she complied with the constructive discharge statute and requests summary judgment on this issue.  This differs from her Response in which she asserts that a jury could find that she met the statutory requirements.

[4]The Court notes that Harris asserts that Wallace's October 11, 2005, e-mail indicates that the County was treating Harris as if she was on leave pursuant to the constructive discharge statute.  While PSOF, Ex. 21, indicates that Wallace stated that the situation was being investigated, he did not state that the County was treating Harris as if she was on leave pursuant to the constructive discharge statute.

1    However, Harris also argues that the constructive discharge statute does not require

2    the statutory notice in situations where "outrageous conduct by the employer including

3    sexual assault, threats of violence directed at the employee, a continuous pattern of

4    discriminatory harassment by the employer . . .  or other similar kinds of conduct if the

5    conduct would cause a reasonable person to feel compelled to resign."  A.R.S. § 23-

6    1502(A)(2).  Harris argues that whether the conduct in this case is "similar" is a fact issue

7    for the jury.  Harris asserts that it is not difficult to imagine an average person reacting with

8    outrage upon being told that an employer could take an employee's private medical

9    information and disseminate it to the public or its customers. Harris asserts that the

10   outrageousness of an employer's circulation of private medical information is evidenced by

11   federal and state law protecting individuals against such dissemination.  *See* Health Insurance

12   Portability and Accountability Act; A.R.S. § 12-2292.  Harris asserts the outrageousness is

13   further evidenced by the Ninth Circuit's recognition of a constitutional right to privacy that

14   includes the right against disclosure of private medical information.  *Tucson's Women's*

15   *Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) ("Individuals have a constitutionally

16   protected interest in avoiding 'disclosure of personal matters,' including medical

17   information.").  Further, Harris asserts that the County has admitted the outrageousness of

18   Oertel's behavior.  *See,* Harris's Statements of Fact, Ex. 19, (the County Administrator stated

19   in a letter to Harris that Oertel's reference to Harris's medical leave and that it was due to a

20   stress related illness was "unacceptable"; *id*., at Ex. 25, p. 11 (the County Administrator

21   informed the Board of Supervisors that Oertel's conduct was "certainly an invasion of Mrs.

22   Harris' privacy.").

23   Harris asserts that the outrageousness also arises from the fact that Oertel was Harris's

24   direct supervisor who was required to approve her medical leave and, therefore, had access

25   to her private heath information.  *See* Restatement, § 46, cmt. e ("outrageousness may arise

26   from abuse by actor of position or a relation with the other that gives actual or apparent

27   authority over the other or power to affect his interests").  Further, that Oertel thought, as

28   expressed by the letter, that Harris's medical condition made her particularly susceptible to

1   stress and upset also demonstrates the outrageousness of Oertel's conduct. *See* Restatement

2   § 46, cmt. e ("outrageousness may arise from an actor's knowledge that the other is

3   peculiarly susceptible to emotional distress, physically or mentally").

4         Harris also argues that the outrageousness of Oertel's conduct may be inferred from

5   his belief that the HIV-AIDS clients were capable of abuse.   A jury could reasonably

6   conclude that Oertel's misrepresentations of Harris's complaints about abuse from her clients

7   compromised her relationships with her clients and could have provoked those clients to

8   become abusive to Harris.   Harris argues that engaging in conduct that has the potential to

9   expose another person to verbal and physical abuse falls within A.R.S. § 23-1502(A)(2) and

10  negates the necessity of notice to establish constructive discharge.   Harris also argues that

11  a jury could reasonably conclude that, in retaliation for her complaints and whistleblowing,

12  Carper sent Harris a letter threatening to terminate her and that the November 16, 2005, letter

13  was sent to further strong-arm Harris into silence regarding her complaints about the

14  disclosure of her medical information.

15        Harris, relying on *Watson v. Nationwide Ins. Co.*, 823 F.2d 360 (9th Cir. 1987), asserts

16  the facts demonstrate a pattern of conduct and not a single, isolated incident.[5]   In *Watson*, the

17  court stated:

18           In this case, we assume, as did the district court, that Nationwide subjected Watson
             to differential treatment (1) by issuing notice of a potential relative rule violation to
19           Watson in mid-June 1984 but not to other similarly situated employees, (2) by
             conspiring to create trumped up charges of inadequate job performance while she was
20           on her honeymoon in early July 1984, and (3) by subjecting her to abusive treatment
             and harassment for several days upon her return to work in mid-July 1984. In
21           particular, we note the evidence in the record, inter alia, that Watson had previously
             always received excellent employment ratings, including one on the day she departed
22           for her wedding and honeymoon; that on her return a company manager told Watson
             in a four-hour meeting in which she cried constantly that she was a poor and
23           incompetent supervisor; that a manager transferred supervisory duties away from her
             and told her to go home; and that a personnel manager told her that she was
24

25   _____

26           [5]In its Reply, Cochise County relies on Ninth Circuit authority that has noted that a
27   "'single isolated instance' of employment discrimination is insufficient as a matter of law to
     support a finding of constructive discharge." *Watson v. Nationwide Ins. Co.*, 823 F.2d 360,
28   361 (9th Cir. 1987).

1  considered a bitch and that she could either resign or be demoted to a position in
which she would be supervised by her subordinate trainees.

2

3  We believe that these facts, though covering a shorter period than that in *Nolan*, could
constitute the necessary aggravating factors such that a trier of fact could (but not
necessarily would) conclude that a reasonable person would find the conditions so
intolerable and discriminatory as to justify resigning. [Citation omitted.]

4

5  *Watson*, 823 F.2d at 361-62.

6  Cochise County points out, however, that despite the arguments of counsel, Harris

7  testified that the only reason she quit was because of Carper's October 4, 2005, letter.

8  Further, Cochise County asserts that it is unreasonable to suggest that two letters are akin to

9  sexual assault, threats of violence, or a continuous pattern of discriminatory harassment.

10  While the actions and consequences from Oertel's letter lasted for over a month

11  (Oertel wrote his letter on September 30, 2005, and Klein's offer of reemployment was on

12  November 16, 2005), a single incident, and its fallout, is at issue in this case.  In discussing

13  the purported outrageousness of the County, many of Harris's arguments are specific to

14  Oertel's letter:  the letter-writer was Harris's direct supervisor who was required to approve

15  her medical leave,  the contents of the letter indicate that Harris's medical condition made

16  her particularly susceptible to stress and upset, and the letter could have provoked Harris's

17  clients to become abusive to Harris.[6]  The additional arguments of outrageousness are also

18  directly related to Oertel's letter:  the County has admitted the outrageousness of Oertel's

19  behavior, the County refused to issue a retraction of the letter, and subsequent

20  correspondence "threatening" to terminate Harris was in retaliation for Harris's complaints

21  and whistleblowing.  This single incident does not establish a pattern of conduct.

22  The facts presented by Harris simply do not present a situation of conduct that is

23  similar to sexual assault, threats of violence, or a continuous pattern of discriminatory

24  harassment by an employer.  The disclosure of Harris's medical information does not

25  compare to the differential treatment, trumped-up inadequacies in job performance, abusive

26

27  [6]The Court notes that some statements with violent overtones do not offend a

28  reasonable person standard.  *Bauer v. Sampson*, 261 F.3d 775 (9th Cir. 2001).

- 13 -

1   treatment, removal of duties, and threatened demotion as presented in *Watson*.  The Court

2   finds that a reasonable jury could not find that the County's conduct was outrageous such

3   that Harris was not required to comply with the constructive discharge notice requirements.

4   Summary judgment in favor of the County on this claim is appropriate.

5

6   *Wrongful Termination – Constructive Discharge*

7          The County asserts that Harris's employment ended with her voluntary resignation

8   and that she cannot maintain a claim for wrongful termination or any loss resulting from the

9   voluntary resignation.  The County asserts that, as a matter of law, unless Harris can show

10  a constructive discharge, Harris cannot maintain wrongful termination claims; Cochise

11  County asserts Harris cannot show a constructive discharge.

12         "'Constructive discharge occurs when the employer's conduct effectively forces an

13  employee to resign.'"  *Ross v. Arizona State Personnel Bd.*, 185 Ariz. 430, 432 n. 1, 916 P.2d

14  1146, 1148 n. 1 (App. 1995), *quoting Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238, 1244,

15  32 Cal.Rptr.2d 223, 876 P.2d 1022, 1025 (1994).  In Arizona, constructive discharge is

16  shown by either of the following:

17         1.  Evidence of objectively difficult or unpleasant working conditions to the extent
       that a reasonable employee would feel compelled to resign, if the employer has been
18     given at last fifteen days' notice by the employee that the employee intends to resign
       because of these conditions and the employer fails to respond to the employees
19     concerns.

20         2.  Evidence of outrageous conduct by the employer or a managing agent of the
       employer, including sexual assault, threats f violence directed at the employee, a
21     continuous pattern of discriminatory harassment by the employer or by a managing
       agent of the employer or other similar kinds of conduct, if the conduct would cause
22     a reasonable employee to feel compelled to resign.

23  A.R.S. § 23-1502(A); *see also Civil Rights Div. of the Ariz. Dept. of Law v. Vernick*

24  *Plumbing and Heating Co.*, 132 Ariz. 84, 86-87, 643 P.2d 1054, 1056-57 (App. 1982)

25  (finding no constructive discharge when employee was screamed at by her supervisor,

26  perceived a "great deal of tension in the air," had her desk given to a new employee and

27  received no further assignments).  "A claim of constructive discharge requires proof that the

28  plaintiff's 'working conditions were so intolerable that a reasonable person would have been

compelled to resign." *MacLean v. State Dept. of Educ.*, 195 Ariz. 235, 245, 986 P.2d 903, 913 (App. 1999), *quoting Rabinovitz v. Pena*, 89 F.3d 482 (7th Cir. 1996).  However, "'not everything that makes an employee unhappy is an actionable adverse action.'"  *Id*, *quoting Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); *see also Watson*, 823 F.2d at 361 (a "'single isolated instance' of employment discrimination is insufficient as a matter of law to support a finding of constructive discharge").

The County argues that the facts of this case do not establish a constructive discharge. Harris worked for nearly a year at a job she enjoyed and had a boss who treated her well. That boss, on one occasion while Harris was on a leave of absence, wrote others that Harris suffered from a "stress related illness.  PSOF, Ex. 9.  While Harris remained on leave, the County informed Harris in writing that she would need to either return to work or seek formal placement on FMLA leave.  Harris simply resigned – she was not suspended, demoted, reprimanded, received a pay cut, or suffered any adverse working condition.

Harris asserts, however, that the determination of whether working conditions are so difficult or intolerable to justify a reasonable employee's decision to resign is typically a factual question for the jury. *Thomas v. Douglas*, 877 F.2d 1428 (9th Cir. 1989); *Watson*, 823 F.2d at 361.  Harris disputes the County's interpretation of facts by arguing that a jury could reasonably conclude that while Harris was out on approved medical leave, her boss publicly disclosed Harris's private medical information without warning or permission for the purpose of retaliation against persons who had publically criticized his job performance. Harris also asserts that a jury could conclude that Oertel lied about the cause of Harris's medical condition and, in attributing it to fictional abuse from Harris's patients, compromised Harris's relationship with her patients and exposed Harris to real abuse from the clients. Harris asserts that a jury could also reasonably conclude that, despite multiple complaints, Oertel, Carper, and the County refused to do anything about the disclosure, refused to issue a retraction, and did not discipline anyone for the disclosure.  Cochise County points out, however, that despite the arguments of counsel, Harris testified at deposition that the only reason she quit was because of Carper's October 4, 2005, letter.

To survive summary judgment on a constructive discharge claim, a plaintiff must show a triable issue of fact as to whether a reasonable person would have felt compelled to quit "because of intolerable and discriminatory working conditions." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir.1994); *see also Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104 (9th Cir.1998) ("In such cases the individual has simply had enough; [the individual] can't take it anymore."). Generally, the issue of whether working conditions were so intolerable that they warranted resignation is usually a question best left to the factfinder. *Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir.1989).

As previously stated, the facts presented by Harris involve a single isolated incident. The Court considers Harris's assertion that she declined Cochise County's offer of reemployment because Cochise County refused to issue a retraction of Oertel's September 30, 2005, letter. The reasonable inference from this assertion is that, had Cochise County issued the retraction, she would have returned to the employment even though her medical information had been included in Oertel's letter. "The only logical conclusion that the Court can draw from [plaintiff's] wish to return to [employer] is that the working conditions there were in fact not intolerable." *Mosakowskiv. PSS World Medical, Inc.*, 329 F.Supp.2d 1112, 1127 (D.Ariz. 2003), *quoting French v. Eagle Nursing Home, Inc.*, 973 F.Supp. 870, 877-78 (D.Minn. 1997). The Court finds that the facts presented by Harris do not present intolerable and discriminatory working conditions. Because Harris has not produced evidence that she quit her employment because her workplace was intolerable, the County is entitled to judgment as a matter of law on the claim that Harris was constructively discharged from her employment.

*Public Policy*

Cochise County asserts that Arizona no longer recognizes the common law public policy wrongful termination claim. *Taylor v. Graham County Chamber of Commerce*, 201 Ariz. 184, 189, 33 P.3d 518, 523 (App. 2001), *citing Cronin v. Sheldon*, 195 Ariz. 531, 991 P.2d 231 (1999). Cochise County argues that the public policy tort of wrongful termination

1    has been eradicated and Plaintiff has not pleaded a termination in violation of A.R.S. § 12-
2    1501.

3        Harris asserts, however, that if an employee is terminated in violation of a state
4    statute, and that statute does not provide a remedy, Arizona's Employment Protection Act
5    explicitly permits the employee to file a tort claim against an employer. A.R.S. § 23-1501(3).
6    Harris asserts that she was wrongfully termination in violation of the privacy provisions of
7    the Arizona Constitution, art. 2, § 8, and that the provision does not provide a remedy. Under
8    A.R.S. § 23-1501(3), therefore, Harris asserts she is entitled to plead and provide a claim of
9    wrongful termination in violation of public policy. Harris points out that Arizona courts have
10   explicitly left open the possibility that the right to privacy in the Arizona Constitution may
11   support a wrongful termination claim when the requisite state action is present, as it is here.
12   *Hart v. Seven Resorts, Inc.*, 190 Ariz. 272, 276, 77, 947 P.2d 846, 850-51 (App. 1997).

13       In *Hart*, the court was considering whether a right to privacy in the Arizona
14   Constitution could support a wrongful termination claim against a private employer. The
15   court did not indicate whether such a cause of action against a government entity could
16   proceed. The Court considers *Hart* in conjunction with *Taylor*, in which the court disagreed
17   with the plaintiff's argument that the Employment Protection Act implicitly provided an
18   alternate remedy when a public policy implication was violated by a termination. In *Taylor*,
19   the court cited to *Hart* by stating that by "enacting the EPA, the legislature "defin[ed] the
20   public policy of this state and limit[ed] the situations in which an employee may bring a
21   wrongful termination suit." *Taylor*, 201 Ariz. at 191, 33 P.3d at 525. The Arizona courts
22   have recognized that the Arizona legislature has declared the public policy in this area of the
23   law. Further, the Arizona legislature has set forth when a wrongful termination claim is
24   appropriate. Arizona no longer recognizes the common law public policy wrongful
25   termination claim. Further, Harris has not pleaded a termination in violation of A.R.S. § 12-
26   1501.

27       Harris also asserts that the Pima County Superior Court rejected Cochise County's
28   contention in this matter. Harris argues that this is the law of the case and there is no

manifest error, change in evidence, or change in law that justifies disturbing that ruling. *Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 715 (9th Cir. 1990) (abuse of discretion to reconsider issue absent manifest error, change in evidence or change in the law). Cochise County asserts the decision is not the law of the case because the issue was not previously decided by the same court or a higher court in the identical case. *Milgard Tempering, Inc. v. Selas Corp.*, 902 F.2d 703, 715 (9th Cir. 1990).

The Superior Court's ruling does not constitute the law of the case. In light of the fact that Arizona no longer recognizes a common law public policy wrongful termination claim, summary judgment in favor of Cochise County on this basis as to the wrongful termination claim is appropriate.

*Americans with Disabilities Act*

Cochise County argues that Harris cannot sustain her Americans with Disabilities Act ("ADA") claim. 42 U.S.C. § 12112(d)(3)(B) allows a covered employer to require a job applicant to submit a post-offer medical examination. 42 U.S.C § 12112(d)(4)(B) allows a covered employer to impose medical examinations and make inquiry into an employee's ability to perform job-related functions. Cochise County asserts that 42 U.S.C. § 12112(3)(B) and (4)(C) provide that documents and information obtained from such employer-initiated inquiries be separated from other personnel information and treated as confidential.[7] Therefore, the County argues that the confidentiality requirements do not apply in this case where the medical information was obtained outside of a medical examination or employer-initiated inquiry into fitness for duty. The Eleventh Circuit has stated:

> The statute enumerates the situations in which an employer may require an employee to submit to a medical examination, *see* 42 U.S.C. § 12112(d), and the regulation states that the results of any such examination shall be considered confidential, *see* 29 C.F.R. § 1630.14(c)(1). In this case, the disclosure that [Plaintiff] complains of was

---

[7]Based on the discussion with counsel during oral argument, the Court accepts these arguments as to 42 U.S.C. § 12112(d)(3)(B) and (4)(C).

not of the result of an examination ordered by [Defendant], but of a voluntary disclosure that [Plaintiff] made to [Defendant]. The statute and regulation cited by [Plaintiff] do not govern voluntary disclosures initiated by the employee, and therefore the district court correctly granted [Defendant's] motion for summary judgment on this count.

*Cash v. Smith*, 231 F.3d 1301 (11th Cir. 2000); *see also Anderson v. Arizona*, No. CV06-00817-PHX-NVW, 2007 WL 1461623, p.8 (D.Ariz. 2007) (dissemination of voluntarily disclosed medical information not actionable under ADA); *Wiggins v. DaVita Tidewater, LLC*, 451 F.Supp.2d 789, 801 (E.D. Va. 2006); *Pouiot v. Town of Fairfield*, 223 F.Supp.2d 233, 243 (D.Maine 2002); *Rohan v. Networks Presentation*, 175 F.Supp.2d 806, 814 n. 12 (D.Md. 2001). Harris argues, however, that information provided to an employer pursuant to a medical leave request is provided pursuant to an "employer inquiry." *Willer v. Tri-County Metro-Trans. Dist. of Or.*, No. 07-CV-303-BR, 2008 WL 3871744 (D.Ore. 2008). Harris asserts that she provided information about her medical condition to the County pursuant to a doctor's excuse attached to her medical leave requests. Harris asserts that there is no evidence that Oertel had specific knowledge of Harris's medical condition before the requests and Oertel received additional information from direct inquiries while Harris was on medical leave. Harris asserts that a jury could conclude that Oertel disseminated information pursuant to employer inquiries. Cochise County argues, however, that summary judgment in favor of the employer was granted in *Willer* because the employer learned of plaintiff's medical condition from a combination of sources to co-worker's and supervisors, as well as disclosure of the condition in connection with employer-mandated worker's compensation forms and medical leave forms. Cochise County asserts that all of the substantive medical information that Cochise County received from Harris was the product of Harris's voluntary disclosure. The Court finds that a genuine issue of material fact is in dispute as to whether the information was provided to Oertel as a voluntary disclosure or as needed for medical leave requests. Summary judgment on this basis is not appropriate.

Cochise County also asserts that Harris's claim of ADA retaliation is not sustainable. To succeed in a ADA retaliation claim pursuant to § 12203(a), a plaintiff must demonstrate that she engaged in protected activity, she suffered an adverse employment decision, and

1   there was a causal link between her activity and the employment decision. *Hashimoto v.*

2   *Dalton*, 118 F.3d 671, 679 (9th Cir. 1997); *EEOC v. Luce, Forward, Hamilton & Scripps*,

3   303 F.3d 994, 1004-05 (9th Cir. 2002). Cochise County argues that unrealized threats of job

4   termination do not rise to the level of an adverse action for purposes of an ADA retaliation

5   claim. *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1381 (10th Cir. 1994) (no showing of

6   adverse employment action where no evidence that threat to evaluate teacher more often than

7   peers was carried out); *Land v. Midwest Office Technology, Inc.*, 114 F.Supp.2d 1121, 1141

8   (D.Kan. 2002) (unrealized threat of future termination or training falls short of level of

9   actionable retaliation).

10   Cochise County asserts that the statement in the October 4, 2005, letter that "I will

11   need to hear from you personally as to what your plans are by 5:00 p.m. Friday, October 7th

12   or, according to County policy, your absence will be considered job abandonment[,]"

13   Amended Complaint, ¶ 75, does not rise to the level of an adverse action for purposes of an

14   ADA retaliation claim. Cochise County compares this case to *McAlindin v. County of San*

15   *Diego*, 192 F.3d 1226, 1239 (9th Cir. 1999), wherein the Ninth Circuit determined that an

16   employer's refusal to grant leave beyond the limits of county policy, coupled with a

17   statement that the employee would be permitted to return to work and that the employee's

18   rights would be honored, was held not to be an adverse action.[8]

19   Harris argues, however, that the County's position is contrary to controlling Ninth

20   Circuit case law that "define[s] adverse employment action broadly" to include "any

21   personnel action that is motivated by a retaliatory animus[,]" including threats of termination.

22   Harris's Response, *citing Ray v. Henderson*, 217 F.3d 1234, 1240-41 (9th Cir. 2000);

23   *Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir. 1997). Harris argues that a jury could

24   conclude that Carper's October 4, 2005, letter was an adverse job action because it included

25   threats of termination motivated by a retaliatory animus. Harris asserts that the retaliatory

26

27   [8]Cochise County also relies on a number of non-Ninth Circuit cases for its assertion
    that it is not an adverse action to inform an employee of the consequences of failure to follow

28   a reasonable doctrine.

1   animus can be inferred from Carper's history of bullying behavior and record of disparate

2   treatment, the temporal relationship between Harris's complaints about Oertel's September

3   30, 2005, letter and Carper's threats of termination, and that Carper relies on Cochise County

4   Merit Rules that were not applicable because they were superseded by Cochise County's

5   FMLA policy.

6       While the Ninth Circuit does take an "expansive view of the type of actions that can

7   be considered adverse employment actions[,]" *Ray*, 217 F.3d at 1241, Harris's reliance on

8   *Ray* for the assertion that an adverse action is "any personnel action that is motivated by a

9   retaliatory animus[,]" is not supported by the text of *Ray*.[9]  This assertion of Harris's requires

10  looking at the motivation of the actor in determining whether there is an adverse action.  In

11  *Ray*, the court set forth the sequence followed:

12       The heart of this dispute is whether Ray suffered cognizable adverse employment
         actions.  Ray asserts that he suffered from changes in workplace policy and pay, as
13       well as from a hostile work environment.  We first examine the definition of an
         adverse employment action.  We then discuss whether the changes in workplace
14       policy and pay constitute adverse employment actions, and whether Ray has
         established a causal link between his protected activities and those adverse
15       employment actions.  Finally, we examine whether Ray's allegation that he was
         subjected to a hostile work environment in retaliation for engaging in protected
16       activity is cognizable under the anti-retaliation provisions of Title VII.

17  *Ray*, 217 F.3d at 1240.  Indeed, it is only after an action is determined to be adverse that the

18  court considers if the action was taken in retaliation.

19       Although Harris asserts that Carper should not have relied on the Cochise County

20  Merit Rules because they were superseded by Cochise County's FMLA policy, that policy

21  only supersedes the Merit Rules to the extent that they are inconsistent with the FMLA

22  policy.  *See* PSOF, Ex. 32, § II.  The FMLA policy discusses when prior approval must be

23  received, when a request for FMLA leave must be in writing, and exceptions to the general

24  rules.  The FMLA policy provides that, if prior approval cannot be obtained, "the employee

25  must submit the request for leave as soon as practicable after the need for the leave is

26

27       [9]The Court notes that, while similar language is found in *Hashimoto*, the court in that
    case similarly did not state that the retaliatory animus should be considered in determining
28  whether there was an adverse action.

discovered." PSOF, Ex. 32, § VII.C. The FMLA policy does not appear to include a provision that provides for a deadline and then a designation of job abandonment. Similarly, the Cochise County Merit Rules do not appear to include such a provision. *See* PSOF, Ex. 28. Therefore, although this case is similar to *McAlindin*, because the reference to county policy does not appear to be supported by an actual policy, the Court cannot conclude that it was not an adverse action. Summary judgment on this basis is not appropriate.

In its Response, Cochise County argues that Harris must demonstrate that she was retaliated against for exercising a right recognized under the ADA. Cochise County's Motion for Summary Judgment cannot fairly be read to include this argument. A district court has the authority to *sua sponte* enter summary judgment if the losing party is on notice that he had to come forward with all of his evidence. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, by Cochise County's raising this issue in its response to Harris's motion, the Court does not find summary judgment to be appropriate on this basis.

In its Motion for Summary Judgment, the County also argues that Harris's § 12203(b) claim must fail because Harris has not alleged a disability, cannot demonstrate that she is disabled under the ADA, has never requested a reasonable accommodation, had no ADA-based right to non-disclosure of information, and was simply given a letter telling her to contact her employer after a 30-day, largely unapproved, leave of absence. *See Champagne v. Servistar Corp.*, 138 F.3d 7, 14 (1st Cir. 1998) (dismissing § 12203(b) claim where employer threatened reassignment, but employee had not asserted ADA disability, or requested reasonable accommodation). However, in its Response, Cochise County agrees proof of an ADA qualifying medical condition is not required as Harris has made it clear that she is not bringing an ADA-based discrimination case. Harris requests that summary judgment be granted in her favor on this issue because a plaintiff does not need to be a qualified individual with a disability to pursue a retaliation claim under the ADA since the anti-retaliation provision protects "any individual." 42 U.S.C. § 12203(b); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3rd Cir. 1997); *Selenke v. Med. Imaging of Colo.*, 248 F.3d

1249, 1264 (9th Cir. 2001) ("in order to prosecute an ADA retaliation claim, a plaintiff need not show . . . an actual disability"). The Court finds that summary judgment in favor of Harris on this issue (i.e., Harris need not establish that she is a qualified individual with a disability) is appropriate.

*Family Medical Leave Act*

Leave under the FMLA may be granted when an employee's serious health condition makes the employee unable to perform the functions of her position. 29 C.F.R. § 825.112(a). A serious health condition generally includes inpatient hospitalization or a period of incapacity that involves absence from work for more than three calendar days. *Id.* A serious health condition also includes "an illness, injury, impairment, or physical or mental condition that involves . . . [a]ny period of incapacity requiring absence from work, school, or other regular daily activities, of more than three calendar days, that also involves continuing treatment by (or under the supervision of) a health care provider." 29 C.F.R. § 825.114(a). Continuing treatment by a health provider includes:

> The employee or family member in question is treated two or more times for the injury or illness by a health care provider. Normally this would require visits to the health care provider or to a nurse or physician's assistant under direct supervision of the health care provider.

29 C.F.R. § 825.114(b)(1).

The FMLA makes it unlawful to "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights. 29 U.S.C. § 2615(a); 29 C.F.R. § 825.220(a)(1). In order to establish an FMLA interference claim, a plaintiff must establish plaintiff was eligible for leave under the FMLA, plaintiff had a serious health condition, plaintiff gave the employer appropriate notice of the need to be absent from work, and plaintiff's FMLA leave was a negative factor in the adverse job action. *See e.g., Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1096 (9th Cir. 2007).

Cochise County asserts that Harris became an "eligible employee" under the FMLA on October 4, 2005. On that date, Harris had an outpatient procedure that lasted two to five

1   minutes for which her treating physician states she could return to work the next day.

2   Cochise County asserts that because Harris was able to return to work and was no longer

3   under continuing medical care, she did not have a serious medical condition.

4         Harris asserts, in her Motion for Partial Summary Judgment, however, that the

5   undisputed facts establish that Harris had a serious health condition for purposes of the

6   FMLA.   Harris argues that she was diagnosed with a bacterial h.pylori infection and

7   esophagitis; this caused Harris to be incapacitated and not able to work as substantiated by

8   Dr. Buttke's work excuse.[10] Further, from May through October, 2005, Harris was under the

9   continuing care of multiple health care providers including two courses of treatment of

10  antibiotics by Dr. Harris, and the treatment and evaluation by Dr. Maddur, totaling more than

11  four visits, including Harris' endoscopic surgical procedure.[11]  Harris also argues that, if an

12  employee is limited to basing an FMLA claim on treatment received on one particular day

13  (as Cochise County appears to argue), it would be impossible to establish the multiple days

14  of treatment and incapacity, which would be contrary to the intent of the statute and its

15  implementing regulations.   Harris asserts that undisputed evidence establishes that, on

16  October 4, 2005, the day she became eligible for FMLA benefits, she had an illness, a three

17  day period of incapacity, and treatment two or more times by a health care provider.

18        At least one circuit court has recognized that, in some situations, whether the evidence

19  supports a finding of a serious health condition may be for a jury to decide:

20        [W]e conclude that this is one of those ubiquitous mixed questions of fact and law.
          As we noted above, the regulations implementing the FMLA (as relevant here) set out

21

22        [10]The exhibit relied upon by Harris does not include a statement from Dr. Buttke that

23  Harris's "physical condition prevented her from working."  PSOF, Ex. 8.  Cochise County

    asserts Dr. Buttke wrote the work release for Harris when he was at their home and going for
24  a cycling ride with Dr. Harris.  Harris asserts that Dr. Buttke mailed her the work release

25  without having conducted any in-person evaluation.

26        [11]Cochise County points out that Harris's deposition testimony does not state that she

27  sought evaluation and treatment from her husband.  Further, Dr. Harris testified to the

    contrary, that he did not formally treat Harris.  Harris's deposition testimony indicates that
28  Dr. Harris prescribed medication, not that she sought evaluation and treatment from him.

1
2
3
4

> an objective test for a FMLA "serious health condition." It is for the fact-finder to look at the record and decide if the evidence supports the elements of that test. Once the fact-finder has affirmatively found the necessary facts, the conclusion that a plaintiff had a "serious health condition" is inescapable as a matter of law. Therefore, if there are no genuine issues raised as to those facts, which are all material, then summary judgment on the question of "serious health condition" will likely be appropriate[.]

5 *Thorson v. Gemini*, 205 F.3d 370, 377 (8th Cir. 2000). In this case, Dr. Harris prescribed

6 medication for Harris, but deposition testimony established that she did not go to him for

7 treatment. Harris's treating physician stated she could return to work the day following her

8 medical procedure, while other evidence establishes that she had at least a three day period

9 of incapacity. Dr. Buttke provided a work release to Harris, but it was not based on an

10 examination. There are reasonable inferences that can be argued by each party regarding this

11 evidence. *See Anderson*, 477 U.S. at 255 (the evidence of the nonmoving party is to be

12 believed and all justifiable inferences are to be drawn in his favor). The Court finds that

13 summary judgment is not appropriate on this basis.

14 　　　　Cochise County further asserts that it did not interfere with Harris' FMLA rights.

15 Cochise County points out that the October 4, 2005, letter specifically invites Harris to

16 request FMLA leave. Cochise County asserts that when Harris spoke to Human Resources

17 personnel on October 5, 2005, she did not request FMLA leave or suggest a continuing need

18 to be absent.

19 　　　　Harris asserts, however, that, where the need for FMLA leave is unforeseeable the

20 employee need only provide her employer with notice sufficient to make the employer aware

21 that the absence is due to a potentially FMLA qualifying reason. 29 C.F.R. § 825.303. In

22 determining whether the employee gave notice of the intention to take FMLA leave, the

23 critical question is whether information imparted to the employer is sufficient to reasonably

24 apprise it of the employee's need to take time off for serious health condition. 29 C.F.R. §

25 825.303. Harris argues that a jury could conclude that Harris's need for FMLA leave was

26 unforeseeable. At the time the need for FMLA leave arose, Harris was absent from work on

27 approved medical leave; Harris believed she had enough medical leave and it was not until

28 Harris was notified that something was wrong with her leave that Harris realized she may

1    need FMLA leave.  Harris asserts that, even then, when Harris contacted Jule Morales, Ms.

2    Morales decided not to put her on FMLA leave based on the anticipated return to work date.

3    Further, Harris asserts that there is evidence that Cochise County was on notice that Harris's

4    absence from work was for a potentially FMLA qualifying reason by the documentation

5    submitted with Harris's medical leave, multiple emails Harris sent to Oertel and other, and

6    the conversation Harris had with Ms. Morales.   Harris asserts that her failure to request

7    FMLA leave when she spoke to Morales is not dispositive because once an employer is put

8    on notice that the FMLA may have relevance, it becomes the employer's duty to determine

9    whether the employee's leave qualifies if there is some doubt.  *Spangler v. Federal Home*

10   *Loan of Des Moines*, 278 F.3d 847 (9th Cir. 2002).

11          The Court finds that a genuine issue of material fact is presented as to whether Harris

12   adequately advised Cochise County that her absence was due to a potentially FMLA

13   qualifying reason.  Summary judgment is not appropriate on this basis.

14          Harris also asserts that a jury may conclude that Carper's October 4, 2005, letter

15   constitutes interference with Harris's exercise or attempt to exercise her FMLA rights.

16   *Williams v. Shenango, Inc.*, 986 F.Supp. 309 (2007) (denying summary judgment because

17   jury could reasonably infer that employer's request that the employee take leave at a different

18   time "chilled" or discouraged assertion of FMLA rights).  The letter informed Harris she

19   needed to call Morales about FMLA leave, but later states the situation had passed the point

20   where it could be resolved with a phone call.  Further, Harris points out that the letter was

21   contrary to County FMLA policies that dictate that an employee is to be placed on

22   provisional FMLA while it is determined whether the employee is eligible for FMLA leave

23   or has a qualifying medical condition.

24          Although the October 4, 2005, letter gave arguably conflicting information as to how

25   Harris should proceed, the letter specifically invited Harris to request FMLA leave.[12]  That

26

27          [12]Although Harris points out that the letter informed Harris she needed to call Morales

28   about FMLA leave, but later states the situation had passed the point where it could be

1   the letter also discussed possible ramifications if FMLA was not requested does not change

2   this fact.  Contrary to Harris's assertions, the Court finds that a jury could not conclude that

3   this letter constitutes interference with Harris's exercise or attempt to exercise her FMLA

4   rights.  The Court finds summary judgment in favor of Cochise County is appropriate on this

5   basis.

6

7   *Defamation, Invasion of Privacy, and False Light Invasion of Privacy*

8        Cochise County argues that the defamation, invasion of privacy, and false light

9   invasion of privacy claims cannot be sustained because there is no evidence that Oertel knew

10  that the statements regarding Harris's "stress related illness" were false.  *See New York Times*

11  *Co. v. Sullivan*, 376 U.S. 254 (1964) (in defamation action, matters affecting conduct, fitness,

12  or role of public officials are clearly matters of legitimate interest to the public; public

13  official cannot recover on a false and defamatory publication unless he proved by clear and

14  convincing evidence that defendant had knowledge of the falsity of the subject statement or

15  acted in reckless disregard of its truth or falsity); Restatement (2nd) of Torts § 625D, Special

16  Note (*Sullivan* principle is recognized in invasion of privacy cases).  Further, a false light

17  invasion of privacy case involving a public official may not be pursued if the "publication

18  relates to performance of his or her public life or duties" and also requires a showing of

19  "actual malice" even where private information is published concerning a public official or

20  public figure.  *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 343, 783 P.2d

21  791,789 (1989).

22       Harris asserts, however, in her Motion for Partial Summary Judgment, that Harris is

23  not a public official.  A public official includes a government employee if that employee is

24  in a position in which the employee has substantial control over the conduct of government

25  affairs, is in a position in which the public has an independent interest in qualifications and

26

27  resolved with a phone call, the letter is arguably informing Harris that a telephone call will
    advise human resources personnel that the FMLA paperwork process needs to be initiated.

28

performance of the employee beyond that interest that the public has in the qualifications of all government employees, and is in a position that invites public scrutiny and discussion of the person holding it. *Rosenblatt v. Baer*, 383 U.S. 74, 85-86 (1966).  However, the *Rosenblatt* Court stated that there may be "other bases" upon which the *Sullivan* standard may be applied on a case-by-case basis. 383 U.S. at 86, n. 12.  Harris asserts that she was a low-level county employee, was not in a position of management or control over Cochise County government policy or health policy, and was not elected or appointed to her position. Unlike a mayor a director of a county department, Harris asserts that her position did not typically invite public scrutiny or discussion.  An HIV/AIDS case worker is not the type of position that the public would have an interest in the performance or qualification beyond that of any other low-level government employee.  Harris points out that Cochise County has not disclosed any evidence that HIV/AIDS case workers were ever the topic of any news coverage or other public scrutiny or interest.

Cochise County asserts, however, that the Supreme Court specifically stated, in *Sullivan*, that it had no occasion "to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of [the] rule, or otherwise to specify categories of persons who would or would not be included." 376 U.S. at 283, n. 23.  Indeed, Cochise County has set forth a number of cases in which the courts have explored the public official/public figure designation after *Sullivan* and *Rosenblatt.  See Rattray v. City of National City,* 51 F.3d 793 (9th Cir. 1994) (former police officer held to be public official); *Olive v. City of Scottsdale,* 969 F.Supp. 564 (D. Ariz. 1996) (police officer held to be public official); *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 344, 783 P.2d 781, 790 (1989) (sheriff's deputies held to be public officials); *Lewis v. Oliver,* 178 Ariz. 330, 337, 873 P.2d 668, 675 (App. 1993) (low-level FAA inspector, with no decisionmaking authority, held to be public official); *Sewell v. Brookbank*, 119 Ariz. 422, 425, 581 P.2d 267, 270 (App. 1978) ("[a]s far as the law of defamation is concerned, teachers are 'public officials.'"); *Klahr v. Winterble,* 4 Ariz.App. 158, 418 P.2d 404 (1966) (student senator of state university held to be public official); *Kahn v. Bower*, 232

1   Cal.App.3d 1599, 1613, 284 Cal.Rptr. 244, 253 (App. 1991) (child welfare worker held to

2   be public official); *Villareal v. Harte-Hanks Communications*, 787 S.W.2d 131 (1991) (child

3   protective services employee held to be public official); *Press, Inc. v. Verran*, 569 S.W.2d

4   435 (Tenn. 1978) (junior social worker held to be public official).

5        Harris asserts, however, that police officers are routinely characterized as public

6   official because police officers have the authority and ability to exercise force, misuse of

7   which can result in deprivation of constitutional rights, personal freedoms, bodily injury, and

8   financial loss, which engenders public interest in officers' qualifications and job

9   performance. *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981). Further, Harris points

10  out that *Sewell v. Brookbank*, 119 Ariz. 422, 425, 581 P.2d 267, 270 (App. 1978), relied on

11  *Basarich v. Rodeghero*, 24 Ill.App.3d 889, 321 N.Ed.2d 739 (App. 1974), which held that

12  teachers are public officials because education is a prime governmental responsibility.[13]

13  Similarly, Harris cites to *Villarreal v. Harte-Hanks Comm., Inc.*, 787 S.W.2d 131, 134

14  (Tex.App. 1990), for her assertion that, because a child welfare worker has the authority and

15  power to remove children from a home, they are considered public officials. However,

16  Harris points out that where a child welfare worker does not have the power to remove,

17  courts have not considered a child welfare worker to be a public official. *See e.g., Erickson*

18  *v. Jones St. Publishers, L.L.C.*, 368 S.C. 444, 470, 629 S.E.2d 653, 667 (2006) (private

19  guardian ad litem, investigating on behalf of family court and who had no unilateral authority

20  to resolve care or custody issues, was not a public officer). Harris asserts that she was more

21  similar to a private guardian ad litem than a police officer or a child welfare worker.

22       Cochise County asserts that Harris's employment also included: a range of client-

23  centered services that linked clients with health care, psychosocial and other services,

24  continuity of care, ongoing assessment of the client's and other family members' needs and

25

26       [13]Harris also cites to cases that have renounced the *Basarich* holding. *Snitowsky v.*
    *NBC Subsidiary (WMAW-TV), Inc.*, 297 Ill.App.3d 304 (Ill.App. 1Dist. 1998); *McCutcheon*
27  *v. Moran*, 99 Ill.App.3d 421, 423-24, 54 Ill.Dec. 913, 425 N.E.2d 1130 (1981); *Kumaran v.*
    *Brotman*, 247 Ill.App.3d 216, 229, 186 Ill.Dec. 952, 617 N.Ed.2d 191 (1993).
28

personal support; performing an initial comprehensive assessment of a proposed client's eligibility, medical needs, and development of a comprehensive/individualized service plan; client monitoring to assess the efficacy of the plan and re-evaluation and revision of the plan as necessary, including client advocacy, education and information; completion of paperwork (the initial paperwork for a client to be eligible for services included obtaining information about the client's income and the availability of other services or other benefits (AHCCCS, VA, prescription plans) for that specific client); performing personal services for each client, including regular quarterly site visits at each client's home; attending physician visits with the client in an effort to work closely with the health care provider and the client to ensure that all necessary services are obtained, including filling out forms for medical care and making arrangements with pharmacies for delivery of necessary medication for specific clients; assisting with the need for alternative therapies information or any other information requested or needed by the client, and use community alternative resources to benefit' clients physical and mental health; assisting the client in filling out applications for other necessary services, responding to the needs of clients with multiple diagnoses, including substance abuse, mental illness, physical disabilities as well as people living in poverty or who are homeless, and assisting the client in obtaining things such as food baskets, and Christmas programs for the client's children; performing outreach activities resulting in public interaction with women, children, families and underserved populations in the community, and providing testing and counseling services or referral as needed; participating in public events which included wellness fairs, the Naco Wellness Initiative Clinics, Housing Opportunities for People Living with AIDS, Teen Maize's or any other health related events to provide HIV testing and counseling services, along with prevention information and supplies. *See* Cochise County's Supp. Statement of Facts, Ex. A.Response, pp. 8-10. Cochise County asserts that Harris performed these functions for approximately 35 AIDS/HIV patients throughout Cochise County. Additionally, the County asserts that Harris gave public interviews and made public appearances concerning the services she provided

1    to the community.  Cochise County asserts that, just as a police officer, teacher, student

2    senator, and social worker are public officials, Harris was a public official.

3         Harris asserts, however, that these duties do not show she had any authority to

4    exercise force, had the authority to cut off benefits, had the authority to remove any program

5    member for benefits, or that any communications were subject to public scrutiny.  In fact,

6    Harris asserts that Cochise County has not presented any evidence of publicity events other

7    than Oertel's conclusory assertions that Harris appeared on TV and/or wrote articles – Harris

8    asserts this claim lacks foundation and is unsupported by any evidence as to the content of

9    any such communications.

10        While the County asserts that Harris's ongoing contact with persons with terminal

11   illnesses makes this case similar to those involving social workers, the Court finds Harris's

12   argument regarding the authority of the social workers to be well-taken.  This case does not

13   present a similar situation to one in which a social worker could remove a child (or, more

14   applicably, could even unilaterally discontinue benefits to a client).  Moreover, Harris was

15   not in a position in which she had substantial control over the conduct of government affairs

16   and was not in a position in which the public had an independent interest in qualifications

17   and performance of the employee beyond that interest that the public has in the qualifications

18   of all government employees.  *Rosenblatt*, 383 U.S. at 85-86.  However, by making public

19   appearances and writing articles, Harris was in a position that invited public scrutiny and

20   discussion of her.  The Court notes Harris does not assert that she did not make the public

21   appearances.   Rather, she asserts that there is no evidence to show the content of

22   communications made in those public appearances.  However, Oertel's affidavit indicates

23   that Harris's television appearance was at the Cochise County Health Department/Agua

24   Prieta Departamento deSalud Bi-national Health Fair in Douglas, Arizona.   Harris's

25   television appearance being at a health fair, in conjunction with Oertel's statement that Harris

26   participated in public outreach and wellness programs as a representative of Cochise County,

27   supports a conclusion that Harris was a public official.  The Court finds that, as a matter of

28   law, Harris was a public official.  Because the evidence does not establish a genuine issue

1    of a material factual dispute that Oertel had knowledge of the falsity of his statement or that

2    he acted in reckless disregard of its truth or falsity (which is required to establish invasion

3    of privacy and false light invasion of privacy public official claims), the Court finds summary

4    judgment in favor of Cochise County on the invasion of privacy and false light invasion of

5    privacy claims is appropriate.

6         Harris seeks summary judgment that the County is not entitled to the qualified

7    privilege defense to protect Oertel's September 30, 2005, letter.  Under Arizona law, a

8    privileged occasion must exist and the occasion for the privilege must not have been abused

9    for a statement to enjoy a qualified privilege defense.  *Roscoe v. Schoolitz*, 105 Ariz. 310,

10   312, 64 P.2d 333, 335 (1970).  Whether a privileged occasion arose is a question of law for

11   the court.  *Id.*, 105 Ariz.. at 313-14, 464 P.2d at 336-37.  To establish that a privileged

12   occasion arose, a defamation defendant must establish that the circumstances in which the

13   communication was made created an obligation to speak.  *Id.*  The Arizona Supreme Court

14   has addressed the concept of a privilege occasion in the context of allegedly defamatory

15   statements by a government actor:

16        The rationale for granting executive government officials immunity for conduct
     within the scope of their employment is that government must be allowed to govern.

17   If executive officials are denied immunity, they may elevate personal interest above
     official duty.  Public servants would be obligating to spend their time in court

18   justifying their past actions, instead of performing their official duties. Ultimately,
     government, including good government, may be hampered and qualified individuals

19   may be hesitant to serve in positions that require great responsibility.

20   *Chamberlain v. Mathis*, 151 Ariz. 551, 554-55, 729 P.2d 905, 908-09 (1986).  The Court

21   further stated:

22        Thus, in a defamation case, qualified immunity will protect a public official if the
     facts establish that a reasonable person, with the information available to the official,

23   could have formed a reasonable belief that the defamatory statement in question was
     true and the publication was an appropriate means for serving the interests which

24   justified the privilege.

25   151 Ariz. at 559, 729 P.2d at 913, *citation omitted*.

26        Cochise County asserts that Oertel's letter constitutes a discretionary public statement

27   which is entitled to, at least, qualified immunity.  Oertel wrote the letter in his role as

28   Program Coordinator for the Cochise County Health Department with the intent to foster a

- 32 -

more appealing, comfortable, and healthy work environment for Harris when she returned and with the intent to improve services to program members by curtailing the abusive conduct of a smaller group of program members. Cochise County asserts that Oertel engaged in a discretionary communication, with members of the program he administers, in an effort to improve the quality of the services, was reporting information to a group that he is duty bound to provide financial/medical services for, and was reporting information to a group that he has a direct, common interest. Cochise County asserts that any of these three goals, by themselves, raises the entitlement to qualified immunity.

Harris asserts that even if Oertel may have been entitled to send a letter regarding program members' behaviors to the program members, Cochise County has made no showing that Oertel was entitled to disclose Harris's private medical information in doing so. Harris also points out that the Klein December 20, 2005, memorandum to the Board of Supervisors stated that, while Oertel may have been entitled to send a letter reprimanding abusive members of the HIV/AIDS program, he was not entitled to send a blanket letter to all program members. That same memorandum made clear that disclosing Harris's medical information constituted a clear lack of judgment and an invasion of Harris's privacy. Harris argues these statements are consistent with Klein's November 16, 2005, letter to Harris in which he stated that Oertel's conduct was unacceptable. Without any authority, Harris argues that these admissions are binding on Cochise County at trial and establish that Oertel was acting outside of his discretionary function.

While Oertel's letter may have been made with the intent to foster a more appealing, comfortable, and healthy work environment for Harris when she returned and with the intent to improve services to program members by curtailing the abusive conduct of a smaller group of program members, may have been made to communicate with members of the program in an effort to improve the quality of the services, and may have been providing information to a group that Oertel is duty bound to provide financial/medical services and with which he has a direct, common interest, Cochise County has not set forth any reason why Harris's medical information needed to be included. The Court finds that Cochise County has not

1   provided a basis for this Court to conclude that the publication of Harris's medical

2   information was an appropriate means for serving the interests which would have justified

3   the privilege.  The Court finds Cochise County is not entitled to qualified immunity.

4        Cochise County also points out that Harris had a medical condition that has a

5   relationship to stress as opined by its expert; therefore, the "false statement" element

6   necessary for defamation and false light invasion of privacy is absent.  *Godbehere*, 162 Ariz.

7   at 341-43, 783 P.2d at 787-89.  Harris asserts, however, that Dr. Maddur and Dr. Harris both

8   testified at deposition that Harris's h.pylori bacterial infection was not caused by stress and

9   that this raises a genuine issues of material fact.  Nonetheless, Cochise County argues that

10  there is no material evidence of knowledge of falsity or reckless disregard for the truth.

11  There is no evidence before the Court that Oertel knew an expert would testify that the

12  medical condition was stress-related.  The Court finds that this issue presents a genuine issue

13  of material fact in dispute.

14       Harris also requests summary judgment on the issue that the mailing of the September

15  30, 2005, letter to approximately 50 third persons is a sufficient publication to support

16  Harris's claim.  *See Hart v. Seven Resorts, Incl.*, 190 Ariz. 272, 280, 947 P.2d 846, 854 (App.

17  1997) (any publication to a third person will support a claim for defamation); Restatement

18  (Second) Torts § 652D, cmt. a (false light claim rests on private matter being given publicity

19  by communicating to public at large or to so many persons that it must be regarded as

20  substantially certain to become public knowledge).  Although Cochise County asserts

21  Harris's evidence does not establish that the mailing went to approximately 50 persons,

22  Cochise County agrees that there was sufficient publication of the September 30, 2005, letter.

23       Harris's claims for false light (Count III) and false light invasion of privacy (Count

24  II) are not sustainable.  However, the Court having determined that there is a genuine issue

25  of material fact in dispute as to whether the statement was false, the Court having determined

26  that the application of qualified immunity is not appropriate, and the parties agreeing that

27  there was sufficient publication of the September 30, 2005, letter, summary judgment is not

28  appropriate on the defamation claim.

1  *Intentional Infliction of Emotional Distress*

2       A claim for intentional infliction of emotional distress requires proof that the conduct

3  by the defendant was "extreme" and "outrageous," the defendant intended to cause emotional

4  harm or recklessly disregarded the near certainty that emotional distress would result from

5  his conduct, and severe emotional distress must have occurred as a result of defendant's

6  conduct. *Mintz v. Bell Atlantic Systems Leasing Intern, Inc.*, 183 Ariz. 550, 553-54, 905 P.2d

7  559, 562-63 (App. 1995).  A trial court is to act as a gatekeeper to determine whether the

8  alleged actions are "so outrageous in character and so extreme in degree, as to go beyond all

9  possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a

10  civilized community[.]" *Id.*, 183 Ariz. at 554, 905 P.2d at 563.  Indeed, in *Mintz*, the court

11  stated that it is "extremely rare to find conduct in the employment context that will rise to the

12  level of outrageousness necessary to provide a basis for recovery for the tort of intentional

13  infliction of emotional distress claim.  *Id.*  Further, liability is not appropriate where a

14  defendant "has done no more than to insist upon his legal rights in a permissible way, even

15  though he is well aware that such insistence is certain to cause emotional distress." *Id.*

16  Cochise County argues that the deliveries of the September 30, 2005, Oertel letter and the

17  October 4, 2005, Moore/Carper letter were for legitimate business purposes and neither letter

18  was outrageous, atrocious, nor intolerable.  *See Mintz*, 183 Ariz. at 554, 905 P.2d at 563

19  ("legitimate business purposes" behind the delivery of a letter also precluded a finding that

20  the conduct was atrocious and utterly intolerable in a civilized society").

21       Harris points out that this Court need not determine whether Oertel's conduct was

22  outrageous enough to create liability, only whether reasonable persons could differ as to

23  whether the conduct is "extreme and outrageous." *Lucchesi v. Stimmell*, 149 Ariz. 76, 79,

24  716 P.2d 1013, 1016 (1986); Restatement, § 46, cmt. h.  As previously stated, Harris argues

25  that the County's conduct was outrageous.[14]

26

27  _____

28       [14]Harris asserts outrageousness is shown by an employer's dissemination of an
   employee's private medical information, the existence of federal and state laws protecting

- 35 -

1    The acts must be "'so outrageous in character and so extreme in degree, as to go

2 beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable

3 in a civilized community.'" *Mintz*, 183 Ariz. at 554, 905 P.3d at 563, *quotation omitted*.

4 Further, the defendant must either intend to cause emotional distress or recklessly disregard

5 the near certainty that such distress will result from his conduct. *Ford v. Revlon*, 153 Ariz.

6 38, 43, 734 P.2d 580 (1987). Another district court has concluded that conduct that included

7 supervisors subjecting an employee to public discussion and ridicule concerning the

8 employee's pregnancy, prior miscarriage, and medical restriction was not outrageous. *See*

9 *Merfeld v. Warren County Health Services*, 597 F.Supp.2d 942 (S.D.Iowa 2009); *see also*

10 *Doe v. Community Health Plan-Kaiser Corp.*, 268 A.D.2d 183, 709 N.Y.S.2d 215 (N.Y.A.D.

11 2000) (where medical records clerk disclosed medical information in patient file conduct was

12 not so outrageous in nature to support intentional infliction of emotional distress claim).

13 Cochise County's conduct is not as extreme as the conduct presented in *Merfeld*. The Court

14 cannot say that the conduct was beyond all possible bounds of decency and that it was

15 atrocious and utterly intolerable in a civilized community. "At most, release of [Harris's]

16 medical [information] . . . was an oversight, not extreme or outrageous conduct." *St.*

17 *Anthony's Medical Center v. H.S.H.*, 974 S.W.2d 606, 611 (Mo.App. 1998). Similarly,

18 Carper's letter, which invited Harris to request FMLA leave, was not atrocious and utterly

19 intolerable in a civilized community. The Court finds summary judgment in favor of Cochise

20 County on these claims is appropriate on this basis.

21 ――――――――――――――――――

22 individuals against dissemination of private medical information, the Ninth Circuit's
recognition of a constitutional right to privacy that includes the right against disclosure of

23 private medical information, the County's admission that Oertel's behavior was
"inappropriate" and an "unacceptable" intrusion into Harris's private affairs, the County

24 Administrator's statement that Oertel's conduct was "certainly an invasion of Mrs. Harris'

25 privacy," that the disclosure was made by a supervisor who was required to approve her
medical leave, Oertel's apparent belief that Harris' medical condition made her particularly

26 susceptible to stress and upset, Oertel's apparent belief that the HIV-AIDS clients were
capable of abuse, Oertel's misrepresentations of Harris's complaints about abuse from her

27 clients, and Carper's letter trying to silence Harris regarding her complaints about the

28 disclosure of her medical information.

1     In its Reply, Cochise County argues that Harris has not presented any evidence of a

2  severe mental injury.  However, Cochise County's Motion cannot fairly be read to include

3  this argument.  A district court has the authority to *sua sponte* enter summary judgment if the

4  losing party is on notice that he had to come forward with all of his evidence.  *See Celotex*

5  *Corp.,* 477 U.S. at 326.  However, by Cochise County's raising this issue in its reply, Harris

6  has not had an opportunity to present her evidence regarding this issue.  The Court does not

7  find summary judgment to be appropriate on this basis.

8

9  *Negligence Claims*

10     Cochise County asserts that Arizona law does not recognize Harris's negligence-based

11  claims (failure to train and supervise its employees regarding Cochise County's privacy

12  policies, failure to enforce its privacy policies related to the dissemination of employee

13  private medical information, and permitting the disclosure of Harris's private medical

14  information in violation of Cochise County's privacy policies).  Cochise County argues that

15  these claims must fail because Cochise County does not have a policy prohibiting

16  dissemination of employee medical information.  Harris, citing to her Statement of Fact 69

17  (which refers to Ex. 31), asserts that the County does have a privacy policy; at a minimum,

18  Harris asserts that a genuine issue of material fact is in dispute.  Cochise County objects to

19  Plaintiff's Statement of Fact 69.  Cochise County argues that the exhibit offered in support

20  of the Statement do not support the facts stated – the exhibit only discusses the location of

21  FMLA records and ADA-type records within an employee's file and the dissemination of

22  medical information related to reasonable accommodations or employee restrictions for ADA

23  purposes.

24     The Court agrees with Cochise County that the documents do not establish that

25  Cochise County has a policy prohibiting dissemination of employee medical information.

26  Summary judgment in favor of Cochise County on this  issue is appropriate.

27     The County further asserts that Arizona law does not recognize such negligence

28  claims in the employer-employee context.  The Court of Appeals of Arizona has held that a

1    plaintiff has no claim under Arizona law for negligence regarding the administration of
2    employer policies.  *Mack v. McDonnell Douglas Helicopter Co.*, 179 Ariz. 627, 880 P.2d
3    1173 (App. 1994).  Indeed an employee "may not use negligence or other tort claims to gain
4    rights not granted by an employment contract."  179 Ariz. at 631, 880 P.2d at 1177.  Harris
5    asserts, however, that *Mack* involved the failure to follow policies of a corporate
6    reorganization, which did not violate public policy.  Harris asserts that this case, in contrast,
7    involves a violation of the public policy in the Ariz.Const., art. 2, § 8.

8        Harris's distinguishment of *Mack* does not appear to be the basis of the court's
9    decision.  There does not appear to be any basis to conclude that a violation of public policy
10   would constitute an exception to the principles laid out in *Mack*.  Summary judgment in favor
11   of Cochise County on this issue is appropriate.

12

13   *Notice of Claim*

14       Cochise County asserts that Harris's demand for $100,000.00 in her Notice of Claim
15   fails to present facts explaining "the amounts identified in the claim by providing the
16   government entity with a factual foundation to permit the entity to evaluate the amount
17   claimed."  *Deer Valley Unified School Dist. v. Houser*, 214 Ariz. 293, 297, 152 P.3d 490, 494
18   (Ariz. 2007).[15]  Harris asserts that her Notice of Claim provides "*any* facts to support the
19   proposed settlement amounts, regardless of how meager."  *Vasquez v. State*, 220 Ariz. 304,
20   309, 206 P.3d 753, 758 (App. 2008), *citing Backus v. State*, 220 Ariz. 141, 204 P.3d 399
21   (App. 2008), *vacated*.  Harris asserts that her Notice of Claim details the types of damages
22   she suffered and the amounts, and contains specific calculations of lost wages and other
23   benefits and damages regarding her federal claims.

24       Cochise County asserts that, because the *Backus* rule has not been adopted by the
25   Supreme Court of Arizona, does not conform with the mandates of A.R.S. § 12-821.01, does

26

27 ───────────────────
28   [15]There does not appear to be any dispute that this issue relates only to the state law
     claims.

- 38 -

not conform with the dictates of *Deer Valley*, and does not address the Supreme Court's prohibition against "quick unrealistic exaggerated demands[,]" *Deer Valley*, 214 Ariz. at 296, 152 P.3d at 493, it is not likely the Supreme Court would accept *Backus* as an accurate reflection of Arizona law on the requirements of A.R.S. § 12-821.01.  Harris points out that *Deer Valley* did not discuss the issue of the amount or quality of facts required to be in a notice of claim and, therefore, is not controlling or binding precedent on this issue.

Since the pleadings have been completed, the Supreme Court of Arizona issued *Backus v. State*, 220 Ariz. 101, 203 P.3d 499 (2009) (*Backus II*).  In *Backus II*, the Court stated that, "[b]ecause the legislature intended that liability of public entities be the rule and immunity the exception, it could not have intended to erect this significant and unpredictable obstacle to claimants' actions against public entities."  220 Ariz. at 106, 203 P.3d at 504. The Court further stated:

> The approach that best furthers legislative intent is to allow a claimant to decide what facts support the amount claimed and to disclose those facts as part of the notice of claim.  As the State points out, only the claimant knows which facts he regards as supporting the amount claimed.  Accordingly, the statutory requirement that the claim include the facts supporting the amount claimed must refer to the view of the claimant, rather than to that of the public entity.  We hold, therefore, that a claimant complies with the supporting-facts requirement of § 12-821.01A. by providing the factual foundation that the claimant regards as adequate to permit the public entity to evaluate the specific amount claimed.  This standard does not require a claimant to provide an exhaustive list of facts; as long as a claimant provides facts to support the amount claimed, he has complied with the supporting-facts requirement of the statute, and courts should not scrutinize the claimant's description of facts to determine the "sufficiency" of the factual disclosure.

220 Ariz. at 106-07, 103 P.3d at 504-05.  During oral argument, counsel for Cochise County stated that he would not be arguing this issue.  "[Harris] provided those facts [she] regarded as supporting the specific amount[] [she] claimed.  Accordingly, [the] notice of claim [] compl[ies] with A.R.S. § 12-821.01.A.

*Timely Notice of Claim, Statute of Limitations, Res Judicata, and Collateral Estoppel Defenses*

Harris has asserted that Cochise County has not established these defenses.  In its Response, Cochise County asserts that its timely Notice of Claim and Statute of Limitations

issues are only applicable if the matter is dismissed and/or the Court finds the Notice of Claim to be deficient and Harris attempts to submit an alternate Notice of Claim. Cochise County also asserts that, if Harris does not seek to add Oertel or Carper as defendants, *res judicata* and collateral estoppel defenses are not applicable. These issues not being ripe, the Court declines to grant relief on these grounds.

Accordingly, IT IS ORDERED:

1.   Plaintiff's Motion to Strike [Doc. # 147] is DENIED.

2.   Plaintiff's Motion for Partial Summary Judgment [Doc. # 132] is GRANTED IN PART AND DENIED IN PART.

3.   Summary judgment is granted in favor of Harris and against Cochise County such that Harris need not establish that she is a qualified individual with a disability.

4.   Defendant's Motion for Summary Judgment [Doc. # 129] is GRANTED IN PART AND DENIED IN PART.

5.   Summary judgment in granted in favor of Cochise County and against Harris on Count II (false light invasion of privacy), Count III (false light), Counts IV and V (intentional infliction of emotional distress), Count VI (wrongful termination), Count VII (negligent training and supervision), Counts VIII, IX, and X (negligence).

6.   Harris's claims of defamation/slander and ADA violation remain pending. Pursuant to the April 1, 2008, scheduling order, as amended by the October 31, 2009, minute entry, the parties shall submit a Joint Proposed Pretrial Order within thirty (30) days of this Order.

DATED this 30th day of September, 2009.


_____
Cindy K. Jorgenson
United States District Judge